**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

M. P., by and through
his parents and natural guardians,
K. P. and D. P.,

Plaintiffs,

-vs-

Independent School District No. 721,
New Prague, New Prague Board
of Education, Arlene Pexa, school nurse,
in her personal and representative capacity,

Defendants.

Civil File No. 01-711 (JNE/JJG)

**PLAINTIFFS' TRIAL BRIEF**

## INTRODUCTION

The Plaintiffs have raised claims for denial of reasonable accommodations in Matthew Poulton's public education and disability discrimination and harassment in the public school through peer harassment, as well as a disclosure of private medical information by a District staff member to students in the education environment that triggered the student-on-student harassment that created a hostile education environment. The Plaintiffs notified the District administration of the student-on-student disability discrimination and harassment both orally and in writing, however, the District response was intentional and deliberate indifference to Matthew's plight by disregarding the complaint including the refusal to follow its own policies and procedures, refusing to conduct an investigation, blame Matthew's disability, offering remedial actions that had the effect of harming Matthew's education, and rescinding an agreement to provide transportation to Matthew to an adjacent public school district after his parents enrolled him in reliance on the agreement for transportation.

## DISPUTED FACTS

On the 10th of January 2000, Kelly Poulton went to the New Prague High School nurse's office to drop off Ritalin for her son, Matthew Poulton, who was attending the 9th grade within the high school. When Kelly handed the medication to Arlene Pexa ("Pexa"), the health paraprofessional for the District, Pexa asked aloud whether the medication was for Matthew's "schizophrenia." The statement was made in front of three students who were in the darkened nurse's office lying on cots. After Pexa made the statement, one of the students sat up on her cot and stated that she would let Matthew know that his medication had arrived. Kelly Poulton left the nurse's office and went immediately to the office of Katie Hennessey ("Hennessey"), the School Social Worker, and relayed what had taken place and her concerns about the disclosure of the private information to other students. Hennessey did not investigate or report the complaint but took a "wait-and-see" approach to the information. Within a short period of time after the disclosure, Matthew's private medical information became common knowledge within the student body and Matthew became the subject of escalating verbal and physical harassment from his peers which included multiple daily instances of physical and verbal harassment. The harassment began at the end of January 2000.

Matthew finally told his parents of the harassment on the 5th of April 2000 and that the harassment had been going on for several months. Kelly Poulton informed Hennessy of the harassment and was having on-going contact with Hennessey about the physical and verbal harassment until the principal of the high school, Connie Nicholson ("Nicholson") became involved and informed Ms Poulton that she was to have no further contact with other staff at the District regarding the harassment. *Id*. Ms Poulton immediately corresponded with the District regarding her concerns, sending the correspondence to the Superintendent and Principal via

certified, receipt return mail. Thereafter, Ms Poulton had weekly contact with Nicholson at a rate of 2-3 telephone calls per week in which she provided Nicholson with oral reports about the physical and verbal abuse that Matthew was enduring. At no time did anyone within the District initiate an investigation or report into the harassment. On the contrary, Ms Poulton was told that what was happening to Matthew was nothing but delusions associated with his schizophrenia.

The daily peer harassment included, but was not limited to, being referred to multiple time per day as a "druggie," "fag," "psycho," "weirdo," "fucker," "gay," "mental kid," "special," "squealer," "idiot" and being told that there is "something wrong with your head," "stay away from us," and "get out of our way." Not only did friends who were previously close to Matthew make these statements, but they were also made by in excess of 44 other identified classmates. The physical abuse included having his head regularly shoved into the drinking fountain, being picked up by his throat, slammed into lockers, grabbed by the throat and thrown to the floor, shoved into elevators by groups of students, spit on, cut and scratched with finger nails and rings and being told that he "belongs in a cage." Matthew never experienced this treatment by classmates before Pexa's disclosure of his private medical data.

It is uncontested that the Defendants never undertook an investigation or any protective or corrective actions taken during the remainder of Matthew's school year. During the summer Matthew was subject to the same discrimination and harassment by his peers but now the conduct was manifested in the community. Ms Poulton continued to make calls over the summer to the District to provide additional information, express her concern for her son's safety on his return to school and seek solutions for the coming school year. When the telephone calls were ignored once again, Ms Poulton provided the District correspondence from Matthew's treating psychiatrist, Dr. Lea Hogan regarding the affects of the peer harassment and abuse. Finally, a

meeting was schedule between Ms Poulton, Ms Nicholson and Ms Hennessy on the 29th of August 2000, to discuss the recent events, parental concerns, correspondence from Dr. Hogan and any proposed corrections. Once again, the District again failed to investigate and provide remedial measure according to its own Harassment and Violence Policy. Instead, the District offered solutions that would isolate and punish Matthew and thus deprive him of the full educational experience and opportunities. Those solutions offered by Nicholson were: 1) arrive late and leave early from his classes; 2) attend only one-half day of schooling with the remainder provided by the parents in home-schooling; 3) attendance in an alternative learning center ("ALC") with "at-risk" and emotional/behavioral disordered students. Ms Poulton told Nicholson and Hennessy that she was not satisfied with its response, and that she would enroll her son in a neighboring public school district. The District agreed with this option and offered to transport Matthew to the District boundary for pick-up by the Northfield Schools for transport to Northfield High School. However, the drop-off location presented a child-endangerment issue for Northfield and they refused to pick Matthew up at the location recommended by the Disrtict. When Ms Poulton called to speak with Ms Nicholson regarding the transportation concerns, Ms Nicholson informed her that it was no longer the District's problem since Matthew was open-enrolled in Northfield and that the District had no further obligation to Matthre. With no acceptable transportation arrangements Ms Poulton had to quit her full-time employment to provide transportation to her son.

At the time Matthew was open-enrolled to Northfield, he was in imminent physical and emotional harm from disability discrimination in the form of serious and persistent verbal and physical assaults by his peers on the basis of his disability.

Plaintiffs will be able to prove each element of the claims with the following testimony from the identified witnesses:

| | |
|---|---|
| Matthew Poulton: | Matthew can testify to all element of the Section 504 and MHRA claims including his disability, its impact on him, his needs in the education environment, the peer harassment, the District response and the affects that the peer harassment and lack of District response had on him. |
| Kelly Poulton: | Ms Poulton, as Matthew's mother, can testify to all element of the Section 504 and MHRA claims including her son's disability, its impact on him, his needs in the education environment, the peer harassment, her efforts to remedy the harassment, the District response and the affects that the peer harassment and lack of District response had on Matthew, his family and the community. |
| Dwight Poulton: | Mr Poulton, as Matthew's father, can testify to all element of the Section 504 and MHRA claims including his son's disability, its impact on him, his needs in the education environment, the peer harassment, his wife's efforts to remedy the harassment, the District response and the affects that the peer harassment and lack of District response had on Matthew, his family and the community |
| Kathy Mahowald: | Ms Mahowald is Matthew's grandmother and lived with the family from March 2000 to October 2000. She spoke frequently with Matthew about what was taking place at school and was present for the telephone contact that Ms Poulton made with school personnel. Ms. Mahowald can also testify to the effects of the incidents in school on Matthew, his family and the community. |
| Dr. Lea Hogan: | Dr. Hogan was Matthew's treating psychologist and can testify to the disclosure of the private information, the on-going verbal and physical assaults in the education environment, her recommendation for Matthew to be moved to another school district, the impact of the disclosure on Matthew and his family members, the response by the District, the emotional and psychological damage sustained by Matthew. |
| Joseph Mahowald: | Joseph is the cousin of Matthew and was present for an incident in which after Matthew left New Prague he continued to be subjected to verbal harassment and threats in the community that affected Matthew significantly. |

| | |
|---|---|
| Steve Schultz: | Steve Schultz is one of the students who harassed Matthew and he can testify to the lack of response by the District to the reported harassment. |
| Tony Neilsen: | Tony Neilsen was a student with Matthew at New Prague High School and can testify to the events that he saw take place within the high school setting with Matthew. |
| Pamela Tietz: | Ms Tietz was the school nurse at the time the disclosure of Matthew's mental health disorder was disclosed and can testify to her concerns about the need for privacy within the nurse's office, as well as the contents of memorandum regarding the events that she circulated. |
| Arlene Pexa: | Arlene Pexa can testify to the disclosure of private medical information that was made and the individuals who overheard the conversation while in the nurse's office. |
| Katie Hennessy: | Katie Hennessy can testify that Kelly Poulton came to her immediately after the disclosure by Ms. Pexa was made and can testify to the contents of her conversations with Kelly Poulton, as well as the correspondence that was sent by Ms Poulton regarding Matthew's educational concerns. Ms. Hennessy also attended meetings regarding Matthew and can testify to those meetings, including the meeting in which the three options were discussed on the 29th of August 200. |
| Connie Nicholson: | Connie Nicholson can testify to the multiple conversations that Kelly Poulton had with her regarding the verbal and physical assaults that were taking place, the requested relief, the correspondence provided to District staff and the response, or lack thereof, by the administration and staff. Ms Nicholson will also be able to testify to the District's policies and procedures. |
| Frances Poplau: | As superintendent of New Prague Public schools, Ms Poplau can testify to the policies and procedures in effect at the time of the alleged harassment. Ms Poplau was in receipt of the correspondence from Ms Poulton regarding the harassment and can testify to the response by the District staff and administration to the correspondence. |
| Don Carlson: | Mr Carlson is acting superintendent and may be called to testify for the purpose of authenticated and creating a foundation for various District records relevant to this action. |

## I. THE DISTRICT DENIED MATTHEW ACCESS TO HIS PUBLIC EDUCATION BY DENYING HIM REASONABLE ACCOMMODATIONS.

Section 504 of the Rehabilitation Act provides, in pertinent part:

> No otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . .

29 U.S.C. § 794.

The federal regulations set forth the specific discriminatory conduct which includes denying a qualified handicapped person the opportunity to participate in or benefit from an aid, benefit, or service that is not equal to that afforded others. 34 C.F.R. § 104.4(b)(i) and (iii).

Matthew had long been identified as disabled with the public school setting and historically had received special education and related services as a student with special needs. The District removed Matthew from services during his 5th grade and the Poultons continued to request assistance for Matthew. The Poultons were steered by the District to a Section 504 that was inadequate to meet his disability-related needs.

The balance struck between the needs of the individual and the needs of the federal funding recipient by the United States Supreme Court in *Southeastern Community College v. Davis,* 442 U.S. 397, 99 S.Ct. 2361, 60 L.Ed.2d 980 (1979), wherein the Court first attempted to set out the parameters of Section 504, requires that an otherwise qualified handicapped individual must be provided with meaningful access to the benefit that the grantee offers. *Id*.

In the instant case, there is no dispute that Matthew is otherwise qualified and the parties have agreed that the New Prague Public Schools is the recipient of federal funding. The final element that Matthew must demonstrate at trial is that he requested reasonable accommodations

*see U.S. Airways, Inc. v. Barnett,* 535 U.S. 391, 401-02, 122 S.Ct. 1516, 152 L.Ed.2d 589 (2002), and those reasonable accommodations were denied. The evidence that will be presented during trial to support the contention that the District denied Matthew reasonable accommodations will be the private medical and mental health providers and public school evaluations that reflect Matthew's need for reasonable accommodations, Ms Poulton will testify to her requests for the needed services to address his identified needs and the District's records will reflect the lack of accommodations that were delivered to Matthew.

The lack of accommodations in conjunction with the deliberate indifference to the peer harassment that Matthew was experiencing not only caused significant emotional harm to Matthew but necessitated that he leave his school and attend high school in a neighboring school, this is *sine qua non* a denial of access to the public benefit for which the District was receiving federal funding.

## II. THE DISTRICT DISCRIMINATED AGAINST MATTHEW SOLELY ON THE BASIS OF HIS DISABILITY.

Section 504 specifically prohibit discrimination against the handicapped, not just based on invidious "affirmative animus," but also based on thoughtlessness, apathy and stereotypes about disabled persons. *See Alexander v. Choate,* 469 U.S. 287, 295-297, 105 S.Ct. 712, 717-718, 83 L.Ed.2d 661 (1985) (pointing to legislative history that § 504 would prohibit the denial of "special educational assistance" for handicapped children). Congress has found that individuals with disabilities are a "discrete and insular minority" who have been faced with restrictions and limitations "resulting from stereotypic assumptions not truly indicative of the individual ability of such individuals to participate in, and contribute to, society." 42 U.S.C. §

12101(a)(7). Section 504 forbids both intentional discrimination against disabled students and "methods of administration" that "have the effect of discriminating on the basis of disability." *See* 42 U.S.C. § 12182(b)(1)(D); *see also* 34 C.F.R. § 104.4(b)(4).

In the instant case, the Plaintiffs will present evidence supporting that the District engaged in intentional disability discrimination and that its methods of administering its school policies and procedures, specifically, those related to Matthew's complaint of peer harassment were deliberately and intentionally disregarded, that Matthew's disabling condition was intentionally blamed for the peer harassment he was experiencing and that Matthew was targeted by the District personnel with punitive responses to his complaints. Finally, the Plaintiffs will present evidence sufficient to conclude that the District took no effective remedial measures to address the peer harassment.

The elements of the claim for disability discrimination that the Plaintiffs will prove are that Matthew was denied access to his education and that the reason for this denial was because of his disabling condition of schizophrenia.

## II. THE DISTRICT'S DELIBERATE INDIFFERENCE TO THE PEER HARASSMENT GAVE RISE TO A HOSTILE EDUCATION ENVIRONMENT.

The plain meaning of the language found in the Rehabilitation Act compels a conclusion that the statutes are intended to bar recipients of federal funding from permitting disability discrimination in their programs or activities. Section 504 prohibits a student from being "subjected to discrimination under any education program or activity receiving federal funding assistance." 29 U.S.C. § 794. The statutes are intended to protect students from the

discriminatory conduct of their peers, as well as the professionals working in federally funded programs. *Letter to the Field*, United States Department of Education, Office of Civil Rights and Office of Special Education Programs (July 25, 2000).

Plaintiffs raise a claim of disability discrimination based on a hostile education environment. Section 504 is not limited to prohibitions of discrimination in the employment context, and courts have found workplace harassment violates federal law while few have considered a student's hostile education environment claim under Section 504 of the Rehabilitation Act. See, *Gaither v. Barron*, 924 F.Supp. 134, 137 (M.D. Ala. 1996); *Guckenberger v. Boston University*, 957 F.Supp. 306, 313 (D. Mass.1997). Courts have also held that the language in Title IX of the Education Amendments of 1972, which is substantially similar to the language in Section 504, forms the statutory basis for a hostile learning environment claim based on sexual harassment. See, *Franklin v. Gwinnett County Pub. Schs.*, 503 U.S. 60, 75 112 S.Ct. 1028, 1037-38, 117 L.Ed. 2d 208 (1992)(holding that the analysis in *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 64, 106 S.Ct. 2399, 2404, 91 L.Ed.2d 49 (1986), applies to claims of sexual harassment under Title IX).

The claim for disability discrimination and harassment as a result of a hostile and non-conducive learning environment created by peer harassment in the public education environment was an issue of first impression with the Minnesota Courts when this case began. The United States Supreme Court recently held in *Davis v. Monroe Board of Education*, 526 U.S. 629, 119 S.Ct. 1661 (1999), that school systems that receive federal education funds may be held liable for damages for peer sexual harassment "where they are deliberately indifferent to sexual harassment, of which they have actual knowledge, that is so severe, pervasive and objectively

offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school." *Davis*, 526 U.S. at 650.

On July 25th, 2000, the United States Department of Education's Office for Civil Rights (OCR) and Office of Special Education and Rehabilitative Services (OSERS) issued a letter to the field on the topic of disability harassment in public schools (attached). The letter concludes:

> [d]isability harassment can have a profound impact on students, raise safety concerns, and erode efforts to ensure that students with disabilities have equal access to the myriad benefits that an education offers. Indeed, harassment can seriously interfere with the ability of students with disabilities to receive the education critical to their advancement.

*Id*. OCR and OSEP conclude that § 504 and the Americans with Disabilities Act prohibit public schools from failing to address and correct disability harassment. The circumstances surrounding Matthew's education in the District presents just such a case. Matthew's Parents sought the assistance of the District administration regarding the on-going peer harassment against Matthew.

Matthew's Parents sought out this assistance, the District's deliberate indifference to the complaint or to take any effective remedial or corrective measures to remedy the peer harassment created and perpetuated a hostile education environment. The physical and verbal assaults began as a consequence of the disclosure to students by a District health paraprofessional of Matthew's mental health condition of schizophrenia. The District had a duty to keep that information confidential. Minn. Stat. § 13.32. The potential damage of such disclosure is foreseeable given the specific restrictions codified in state statute to prevent such disclosure. This disclosure and the stigma associated with this mental health disorder impairment resulted in Matthew being severely and repeatedly assaulted both verbally and physically. When the District was notified of the hostile environment both verbally and in

writing, the District knowingly declined to take any action, and ignored the requests for a meeting with the Parents. The solutions that the District staff did offer in the meeting on August 29, 2000, one week before school was to start for the 2000/2001 school year, had the effect of further isolating Matthew rather than addressing the discriminatory conduct of his peers. To date, the District continues to allege that the discriminatory conduct did not take place. As a result of the damage that Matthew had already sustained, and the non-responsiveness of the District, Ms Poulton informed the District staff at the meeting that she would be placing Matthew in the Northfield High School. She sought out the assistance of Ms Nicholson for transportation and completed the open-enrollment forms as directed by Ms Nicholson. When Ms Poulton determined that the transportation offered by Ms Nicholson was not appropriate because it endangered Matthew, Ms Nicholson withdrew further support citing that the open-enrollment documents were signed and there was nothing further than she needed to do or would no on Matthew's behalf.

The elements of the hostile education environment that the Plaintiffs must prove are that Matthew was subjected to the verbal and physical assaults, that those assaults were unwelcome, that the assaults were due to his disability, that the District was on notice of the peer harassment and its response to the peer harassment was deliberately indifferent resulting in substantial emotional harm to Matthew as well as the denial of equal access to his public education.

## CONCLUSION

Plaintiffs will present all evidence sufficient to meet their burden of proof in each element of the identified claims.

Respectfully submitted,

**KANE EDUCATION LAW, LLC.**

Dated:

By: /s/ Margaret O'Sullivan Kane
Margaret O'Sullivan Kane /ID # 220243
Attorney for Plaintiffs
1654 Grand Avenue
Suite 200
Saint Paul, Minnesota 55105
651/222-8611