**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

Civil File No. 01-771 (JNE/JEL)

M.P., by and through his parents
And natural guardians, D.P. and K.P.,

Plaintiff,

v.

Independent School District No. 721,
New Prague,

Defendant.

**DEFENDANT'S TRIAL BRIEF**

---

## INTRODUCTION

Plaintiff Matthew Poulton commenced this lawsuit against Defendant New Prague School District (the "school"), bringing a range of claims under state and federal law relating to the education and services the school provided, and to its data privacy practices. In brief, Plaintiff claimed that during his ninth grade year, the school failed to accommodate his disability, disclosed to the student body his schizophrenia diagnosis, failed to remedy allegedly resulting student-on-student harassment, and thereafter again failed make an adequate accommodation. Judge Doty granted the school's motion for summary judgment and dismissed all claims. On review, the Court of Appeals affirmed in part, reversed in part, and remanded for trial with the following mandate: "Because there are disputed facts regarding the effect of the disclosure, the resulting harassment, and the District's failure to address and remedy the discrimination that M.P. may have experienced due to his disability,

we remand this claim to the district court for further consideration." *M.P. v. Independent School District No. 721 (I)*, 326 F.3d 975, 982-83 (8th Cir. 2003). Remanding again after a second appeal regarding jurisdiction, and more specifically, the relationship between the surviving claim and those dismissed, the Court of Appeals reiterated the scope of the remand: "On remand, the court is to consider whether the School District acted in bad faith or with gross misjudgment when it failed to take appropriate action to protect M.P.'s academic and safety interests after his disability was disclosed to the student body." *M.P. v. Independent School District No. 721 (II)*, 439 F.3d 865, 868 (8th Cir. 2006).

Accordingly, this trial is about what the school did or did not do *after* it allegedly disclosed his mental illness. It is the law of the case that the disclosure itself was not intentional, and that the school is not liable to pay money damages for the consequences of that disclosure. *See M.P. v. Independent School District No. 721*, 200 F.Supp.2d 1036, 1041 (D.Minn. 2002) (holding plaintiff cannot sustain a claim with respect to the release of the information because plaintiff cannot establish that the nurse's aid acted with deliberate indifference); *see also M.P. (I)*, 326 F.3d at 982-82 (establishing the scope of remand cited above); *M.P. (II)*, 439 F.3d at 868 (same). Thus, Plaintiff's allegations about the consequences of the broader community learning of his diagnosis, and his allegations about harassment occurring *outside* of New Prague High School, are out of bounds. The only issues properly before the jury are (1) was the Plaintiff in fact harassed by other students because of

his disability, and (2) did the school act with bad faith or gross misjudgment in responding to any harassment brought to its attention.

## STATEMENT OF FACTS

The Court is well familiar with the general underlying facts from a summary judgment perspective. Those facts will not be repeated in great detail. Rather, this brief will focus on key evidence to be adduced at trial.

### 1. Background

At the time this matter arose, Plaintiff was a fourteen-year-old ninth-grade student attending New Prague Senior High School. He lived with his adopted parents within the boundaries of the New Prague School District. He is now twenty one years of age, and is not under a guardianship.

Plaintiff received special education services from the New Prague School District from third grade (when the student began to reside in the School District) into fifth grade. All special education services were discontinued during the spring of Plaintiff's fifth-grade year with the parents' informed consent. In December 1998, his eighth-grade year, Plaintiff developed difficulties dealing with and responding to anger issues, and began having hallucinations. He was diagnosed with schizophrenia. His psychiatrist prescribed Risperdol, and he responded to the medication. Because of his progress, his mother, Kelly Poulton, did not want him to start high school with the "label" of a special education student, and did not want him to know that he had a disability.

The School District initiated a team meeting in February 1999 and developed a Section 504 accommodation plan. Under the plan, Plaintiff's teachers were notified that they should be aware of the following behaviors:

> "1. Invites others to reject him
> 2. Will set himself up, appear to anticipate failure and give up easily without sense of persistence
> 3. Potential for impulsivity with anger
> 4. Anxiety and somatic complaints
> 5. Hypervigilence (he is extremely oversensitive to criticism and will find rejection easily. He is very sensitive to <u>perceived</u> criticism.)"

(Emphasis in original.) As modifications under the plan, Plaintiff would be allowed to work with other students with comparable abilities, was allowed access to the school counselor or social worker when needed, and was allowed to use the restroom and access the school nurse as needed. His teachers also attempted to reduce Plaintiff's expectations if he appeared highly anxious. The team also agreed to monitor M.P.'s progress and maintain communication with his parents. A team meeting was held on August 30, 1999, with Mrs. Poulton, to discuss the new Section 504 plan. The school social worker, Katie Hennessy, offered to meet with Plaintiff periodically, but his mother said no. Mrs. Poulton told Hennessy that Plaintiff already had enough counselors outside of school, and that Plaintiff would report to Hennessy if need be.

On January 10, 2000, Mrs. Poulton went into the high school nurse's office to drop off a new prescription for Plaintiff. One or two other students were also in the room lying on cots. Plaintiff's mother gave Arlene Pexa, the health

paraprofessional, a bottle of Ritalin. Because Pexa was familiar with Ritalin as a treatment for attention deficit/hyperactivity disorder, she asked in a soft voice, "Is this for treatment of the schizophrenia?" Pexa then told Plaintiff's mother, "He will not know his medication is here. Would you like me to call him down?" At that time, a female student who was resting on a cot in the health room, sat up and stated that Plaintiff was in her next class, and she would tell him to come down. Pexa told the student, "No," and advised Plaintiff's mother that she would call him out of class.

**2. After the "disclosure."**

Plaintiff's mother was visibly upset that Pexa had said the word "schizophrenia" in the nurse's office, and went immediately to Hennessy to express her concern that news of Plaintiff's illness would get out. Hennessy sent an e-mail to Plaintiff's teachers, advising them to watch for any changes in Plaintiff because he was starting a trial of Ritalin. The month of January, however, passed without incident. The month of February passed without incident. The month of March passed without incident. Plaintiff reported no verbal or physical harassment to anyone at the school, to the psychiatrist with whom he treated regularly, or even to his mother.

On April 5, 2000, Plaintiff told his mother that some kids had been calling him names, including "psycho." Witnesses for the Defendant will confirm that high school kids are not discriminating in their use of many of the insults alleged, including "freak," "weirdo," "loser," "gay," or "psycho." Rather, kids used these

common insults indiscriminately, without any actual suspicion that the kids they insult have a diagnosed mental illness. However, Mrs. Poulton concluded that word of Plaintiff's mental illness was out, and called Hennessy to report that "her worst fears were confirmed." Mrs. Poulton kept her son home from school for a couple of days and told him, for the first time, of his schizophrenia diagnosis. Hennessy contact the dean of students, Dan O'Brien, who asked Plaintiff's teachers to keep an eye out for any harassment. They did not observe any. Three weeks later, however, on April 27, 2000, Plaintiff's parents sent High School Principal Connie Nicholson a letter stating that they believed her son had been subjected to on-going teasing with other students in the high school as the direct result of her conversation with Pexa back in January, 2000. The letter did not allege that Plaintiff was being physically assaulted. The letter requested that Ms. Nicholson address the issue by May 5, 2000.

On Monday, May 1, Nicholson called Mrs. Poulton to discuss her concerns and as a result of the telephone call, she notified the school counselor and the dean of students of the concerns. Nicholson directed Dan O'Brien, Dean of Students, to notify Plaintiff's teachers of the concern and to monitor his contact with students to see if he was, in fact, being teased. A week later, on May 8, Plaintiff came home from school and reported to his mother that he had been thrown against a locker and teased that day. Mrs. Poulton immediately called Nicholson to report the incident. Nicholson notified the dean of students and he called in to his office the three students Mrs. Poulton had identified. While the three students reported a

less one-sided version of incident, Dean O'Brien warned them to cease and desist and received assurances from them that they would. Approximately the next day, the three students gave Plaintiff a hard time in the lunch room for snitching on them. A lunch aid observed the confrontation, and escorted Plaintiff away from the other three, and out of the lunch room.

While Plaintiff now alleges that further incidents occurred, he admits that he never reported any further harassment to the school. Further, for the remainder of the school year, his teachers observed none.

During the summer of 2000, Nicholson discussed Plaintiff's educational program for tenth grade with Mrs. Poulton. They agreed to meet in August, prior to the start of the 2000-2001 school year. On August 29, 2000, they met, along with the school social worker, Katie Hennessey. They discussed a number of options for Plaintiff's education for the upcoming school year. The options included allowing Plaintiff to leave his classes five or ten minutes early so that he could avoid other students in the hallways. He could also be accompanied from class to class by a staff member. Another option was for Plaintiff to attend schools at the Alternative Learning Center, a school for students with different learning styles or learning needs. The group also discussed having Plaintiff attend school for half of the day and then receive the remainder of his instruction through a "homebound" program whereby he would receive his education at home or another site off school grounds. They discussed the availability of open enrollment, whereby Plaintiff would enroll in a neighboring school district, and

reviewed the different districts surrounding New Prague. Unbeknownst to the school, Plaintiff's psychiatrist had already recommended to the Poultons that Plaintiff attend a different school. No decision was reached at the meeting, and shortly thereafter, Mrs. Poulton advised Nicholson that they were going to open-enroll Plaintiff in the Northfield School District. The school offered to transport Plaintiff to the school district border, where he would be picked up by the Northfield school bus. The logistics of the transfer were unacceptable to the Poultons, so they elected to arrange private transportation for Plaintiff. Plaintiff did not return to the New Prague School District after his freshman year.

**KEY FACTUAL AND LEGAL ISSUES**

The question on remand is narrow. It is whether the District has violated Section 504 of the Rehabilitation Act of 1973. Specifically, the Court of Appeals has stated that this Court "is to consider whether the School District acted in bad faith or with gross misjudgment when it [allegedly] failed to take appropriate action to protect M.P.'s academic and safety interests after his disability was [allegedly] disclosed to the student body." *M.P. (II),* 439 F.3d at 868. Of course, the Court of Appeals was reviewing a summary judgment, not resolving disputed facts. Thus, it is not the law of the case that the school failed to take appropriate action or that Plaintiff's disability was ever disclosed to the student body, and these facts are disputed.

Under Section 504, a plaintiff must allege and prove:

> (1) that the plaintiff is a "disabled individual" under the Act; (2) that the plaintiff is "otherwise qualified" for the position or program sought; (3) that the plaintiff was excluded from the position sought or denied benefits from a program or activity solely by reason of plaintiff's disability; and (4) that the program or activity in question received federal financial assistance.

*M.P.(II)*, 439 F.3d at 867 (citing *Timothy H. v. Cedar Rapids Cmty, Sch. Dist.,* 178 F.3d 968, 971 (8th Cir. 1999); *see also Prins v. Indep. Sch. Dist. No. 761*, 27 IDELR 312 (D.Minn. 1997) (citing *K.M. v. Indep. Sch. Dist. No. 284*, 24 IDELR 533, 536 (D.Minn. 1996) Of those elements, only the third is in dispute and the question at trial will be whether M.P. was denied benefits of a program or activity solely by reason of his disability. A plaintiff must also allege and make a showing of "either bad faith or gross misjudgment . . . before a Section 504 violation can be made out, at least in the context of education of handicapped children." *Monahan v. State of Neb.*, 687 F.2d 1164, 1171 (8th Cir. 1982); *M.P.*, 439 F3d at 867(citing *Monahan); Hoekstra v. Indep. Sch. Dist. No. 283*, 916 F.Supp. 941, 948 (D.Minn.), *aff'd*, 103 F.3d 624 (8th Cir. 1996) (citing *Monahan*).

Because Matthew is now 21 years of age, he is the sole plaintiff. No longer can his parents bring this action on his behalf. *See* Federal Rule of Civil Procedure 17(c) (an "infant or incompetent person" to have a representative, such as a guardian, who may sue or be sued on the infant's behalf). Fed.R.Civ.P. 17(c); *Mason v. Royal Indemnity, Co.*, 35 F.Supp. 477, 480 (N.D.Ga. 1940)(an infant's right to have a representative sue on his or her behalf expires with the infant's

minority). All claims and requests for relief belong exclusively to Matthew. His parents have no available claims or remedies in their own right.

**ISSUE: Whether the School District grossly departed from accepted standards among educational professionals in exercising professional judgment when responding to the letter from M.P.'s parent stating that he was being teased at school.**

The "bad faith or gross misjudgment" standard is, by design, very difficult for plaintiffs to meet. The Eighth Circuit has repeatedly explained that Section 504 is not intended to create "general tort liability for educational malpractice." *Monahan*, 687 F.2d at 1171; *see also Smith by Townsend v. Special Sch. Dist. No. 1*, 184 F.3d 764, 769 (8th Cir. 1999)(quoting *Monahan*, 687 F.2d at 1171); *Heidemann v. Rother*, 84 F.3d 1021, 1032 (8th Cir. 1996)(same). Accordingly, the Eighth Circuit has explained, "[s]o long as the state officials involved have exercised professional judgment, in such a way as not to depart grossly from accepted standards among educational professionals, we cannot believe that Congress intended to create liability under § 504." *Monahan*, 687 F.2d at 1171.

Good faith efforts in pursuit of legitimate ends will not result in liability. *Hoekstra*, 916 F.Supp. at 949 (citation omitted). "[L]iability may be imposed only when the decision by the professional is such a substantial departure from accepted professional judgment, practice or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Monahan*, 687 F.2d at 1171 (quoting *Youngberg v. Romeo*, 457 U.S. 307, 323 (1982)).

Courts should refrain from second-guessing the school administrators in the disciplinary decisions chosen by the schools n dealing with peer harassment." *Doe v. Lennox Sch. Dist. No. 41-4*, 329 F.Supp.2d 1063, 1068-69 (D.S.D. 2003)(citing *Davis v. Monroe County Sch. Bd. of Educ.*, 526 U.S. 629, 648, 119 S.Ct. 1661 (1999)). As the U.S. Supreme Court explained in an analogous case, public schools "are unlike the adult workplace . . . children may regularly interact in a manner that would be unacceptable among adults." *Davis v. Monroe County Sch. Bd. of Educ.*, 526 U.S. 629, 651-652, 119 S.Ct. 1661, 1675 (1999)(Title IX case of alleged peer on peer sexual harassment). Because students are "still learning how to interact appropriately with their peers [i]t is thus understandable that, in the school setting, students often engage in insults, banter, teasing, shoving, [and] pushing . . . that is upsetting to students subjected to it." *Id*. However, "[d]amages are not available for simple acts of teasing and name calling among school children . . . even where these comments target differences" in protected class status. *Id.*

The evidence will show that the District exercised accepted professional judgment in responding to the information M.P.'s mother provided regarding his interactions with his classmates at school. The first the District knew of any concerns regarding interactions between M.P. and is classmates was in April 2000, several months after he claims it began. The evidence will show that the District notified all of M.P.'s teachers of his parent's concerns and directed them to monitor his contact with students to see if he was, in fact, being teased. Not one

teacher reported witnessing any kind of verbal or physical altercation between M.P. and his classmates.

The dean of students spoke to the three boys K.P. identified as bothering M.P. He directed them cease any and all teasing behavior towards M.P. and received their assurances that they would. Mr. O'Brien received no subsequent reports that the three boys were continuing to tease M.P. or bother him in any other way.

During May 2000, Ms. Nicholson spoke to K.P. two or three times regarding M.P. Mrs. Poulton did not report any subsequent harassment. M.P. did not report any subsequent harassment, either. In fact, at no time during the winter and spring of 2000, did M.P. speak to any teacher or administrator complaining of harassment by his classmates. K.P. never mentioned any physical harassment until she filed this lawsuit. Given the limited information it was provided and the short time in which to address it, the evidence will show that District's response was appropriate relative to the complaint and well within accepted professional judgment and practice.

The evidence will further show that the District properly exercised professional judgment in addressing the Student's program for the 2000-2001 school year. During the summer of 2000, she discussed with K.P., M.P.'s educational program for tenth grade. They agreed to meet in August, prior to the start of the 2000-2001 school year. On August 24, 2000, Ms. Nicholson contacted

K.P. to set a date to meet. K.P. and her family were leaving for vacation; Ms. Nicholson and K.P. agreed to meet on August 29, 2001.

They did meet that day, along with the school social worker, Katie Hennessey. By this time, K.P. had a letter from M.P.'s doctor "highly" recommending that M.P. not attend New Prague schools for his 10th grade year. Ms. Nicholson, Ms. Hennessey, and K.P. discussed a number of options. The options included allowing M.P. to leave his classes five or ten minutes early so that he could avoid other students in the hallways. He would also be accompanied from class to class by a District staff member. Another option was for M.P. to attend schools at the Alternative Learning Center, a school for students with different learning styles or learning needs. The group discussed having M.P. attend school for half of the day and then receive the remainder of his instruction through a "homebound" program whereby he would receive his education at home or another site off school grounds. The availability of open enrollment, whereby M.P. would enroll in a neighboring school district, was examined and the different districts surrounding New Prague were reviewed. No decision was reached at the meeting regarding M.P.'s educational program for the upcoming school year. Shortly after that, K.P. called Ms. Nicholson and advised her that they were going to open-enroll M.P. in the Northfield School District. M.P. did not return to the New Prague School District.

The District's actions and the options it presented are proper exercise of professional judgment and standards. Its examination of different locations for

M.P. to continue his education was particularly appropriate in light of the recommendation from M.P.'s treating psychologist that he not return to the high school.

**ISSUE: Whether the District Intentionally Discriminated Against M.P.**

Punitive damages are not available under the ADA or Section 504 of the Rehabilitation Act. *Barnes v.* Gorman, 536 U.S. 181, 122 S.Ct. 2097 (2002); *Nieves-Marquez v. Commonwealth of Puerto Rico,* 353 F.3d 108*,* 126 (1st Cir. 2003). To establish a claim for compensatory damages, the Plaintiffs must demonstrate bad faith or gross misconduct by proving intentional discrimination. *M.P*, 200 F.Supp.2d at 1040 (citing *Bowers v. Nat'l Collegiate Athletic* Ass'n, 118 F.Supp.2d 494, 507 (D.N.J. 2000)(Holding "compensatory damages are not available for violations of Section 504 absent a showing of intentional discrimination."); *Smith v. Me. Sch. Admin. Dist. No. 6*, 2001 WL 420361 at *6-7 (D. Me. 2001)(citing *Bartlett v. N.Y. State Bd. of Law Examiners*, 156 F.3d 321, 331 (2nd Cir. 1998), *vacated in part on other grounds*, 527 U.S. 1031 (1999)("Because the plaintiffs seek compensatory damages under [the Rehabilitation Act], they must prove intentional discrimination.")). Intentional discrimination may be shown by either demonstrating that Defendants acted "out of personal animosity or ill will or discriminatory animus" or acted with "'deliberate indifference to the strong likelihood that a violation of federally protected rights [would] result' from their actions." *M.P.*, 200 F.Supp.2d at 1040 (citing *Smith*, 2001 WL 420361 at *7 (citing *Ferguson v. City of Phoenix*, 157 F.3d 668, 675 (9th Cir. 1998) and quoting *Bartlett*, 156 F.3d at 331)).

In this case, M.P. will be unable to establish that the School District acted with the requisite discriminatory intent. First, there are no facts to suggest personal animosity, ill will or discriminatory animus. M.P. will be unable to point to anything other than his general allegation that the School District did not take remedial action when informed that he was being harassed at school. He cannot establish any motive behind the allegation.

Likewise, M.P. cannot show that the School District acted with "deliberate indifference." As discussed above, the District responded to the information it received. The principal informed the dean of students and counselor. She directed the dean of students to notify M.P.'s teachers and instruct them to monitor M.P.'s interactions with peers in the classroom and the hallway. The dean spoke with the three boys identified as having teased M.P. He directed them to stop their behaviors and received assurances that they would. These facts will show that the District was in no way "indifferent" to the complaint it received. Rather, the evidence will show that the District did respond in an appropriate manner.

## CONCLUSION

The evidence to be adduced at trial will show that the School District did not act in "bad faith" or with "gross misjudgment" in the manner in which it responded to M.P.'s complaints of peer harassment at school and, therefore, is not liable under Section 504 of the Rehabilitation Act of 1973.

Date: August _28_, 2006

KENNEDY & GRAVEN, CHARTERED

By______/s/ Charles E. Long____________

Marie C. Skinner (#165025)
Charles E. Long (#239604)
Peter G. Mikhail (#249907)
200 South Sixth Street, Suite 470
Minneapolis, MN 55402
Telephone: (612) 337-9300
*Attorneys for Defendant*